UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JAMES MANSON, | : | |
| Plaintiff, | : | CASE NO. 3:24-cv-00876 (MPS) |
| | : | |
| v. | : | |
| | : | |
| WARDEN CARON, et al., | : | |
| Defendants. | : | September 13, 2024 |
| | : | |

## INITIAL REVIEW ORDER

Plaintiff James Manson, an inmate incarcerated at Robinson Correctional Institution ("Robinson") in Enfield, Connecticut, filed this case under 42 U.S.C. § 1983, naming three defendants. (ECF No. 9). The plaintiff alleges these defendants violated his constitutional rights by subjecting him to unreasonable strip searches after video visits. *Id.* ¶¶ 26–34. The plaintiff seeks monetary damages and injunctive relief. *See id.* at 8.

The Court must review prisoner civil complaints and dismiss any portion of the complaint that is frivolous or malicious, that fails to state a claim upon which relief may be granted, or that seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915A. This requirement applies to all prisoner filings regardless of whether the prisoner pays the filing fee. *Nicholson v. Lenczewski*, 356 F.Supp.2d 157, 159 (D. Conn. 2005) (citing *Carr v. Dvorin*, 171 F.3d 115 (2d Cir. 1999) (per curiam)).  The plaintiff has paid the filing fee.

The Court has thoroughly reviewed all factual allegations in the plaintiff's amended

complaint[1] and conducted an initial review of the allegations therein pursuant to 28 U.S.C. § 1915A. Based on this initial review, the Court orders as follows.

## I. Allegations

While the Court does not set forth all of the facts alleged in the plaintiff's amended complaint (ECF No. 9), it summarizes his basic factual allegations here to give context to its ruling. The plaintiff is currently incarcerated at Robinson, *id.* ¶ 3, which implemented video visits during the COVID-19 pandemic to reduce transmission of the virus throughout the prison system. *See id.* ¶ 11. Video visits continue to be an alternative to contact or other non-contact social visits. *Id.* Inmates visit by video using a laptop, tablet, or mobile device. *Id.* ¶ 12. Visitors do not enter the prison for video visitation. *Id.*

On March 3, 2024, the plaintiff had a video visit with an approved visitor. *Id.* ¶ 15. After the visit ended, correctional officers told the plaintiff and other inmates who had ended video visits to stand by the door used to exit the visitation room. *Id.* Defendant Stewart, a correctional officer, told the plaintiff to follow him through the exit door. *Id.* ¶ 16. The plaintiff then followed Stewart into an area with partitioned stalls. *Id.* Once there, Stewart ordered the plaintiff to remove his clothing and submit to a strip search under threat of being sent to the Restrictive Housing Unit if he did not comply. *Id.* ¶ 17.

---

[1] The plaintiff filed his original complaint on May 15, 2024. ECF No. 1. The plaintiff filed an amended complaint on June 20, 2024. ECF No. 9. Under Rule 15 of the Federal Rules of Civil Procedure, the plaintiff may amend his complaint "once as a matter of course no later than: (A) 21 days after serving it, or (B) if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier." Fed. R. Civ. P. 15(a). Because the Court has not ordered service on the plaintiff's complaint, he is permitted to amend his complaint "once as a matter of course" under Rule 15(a). The plaintiff's amended complaint is now the operative complaint. *See Int'l Controls Corp. v. Vesco*, 556 F.2d 665, 668 (2d Cir. 1977) ("[A]n amended complaint ordinarily supersedes the original and renders it of no legal effect.").

The plaintiff began removing his clothing as instructed. *Id.* ¶ 18. As Stewart was undressing, another correctional officer entered the strip search area escorting two other inmates who had also finished their video visits. *Id.* That officer similarly ordered the other two inmates to undress and submit to a strip search. *Id.* After the plaintiff removed his clothing and handed it to Stewart, Stewart instructed the plaintiff to "lift his testicles, raise his arms, turn around, bend, squat, [and] cough while spreading his buttocks." *Id.* ¶ 19. After doing so, Stewart directed the plaintiff to turn around and "open his mouth using his hands that he just used to lift his testicles and to spread his buttocks." *Id.* Stewart acknowledged to the plaintiff after the strip search that he knew that the plaintiff could not smuggle contraband through the computer and that it made no sense to strip search inmates after video visits, but that he was just following the warden's orders. *Id.* ¶ 20.

The plaintiff wrote an inmate request about the strip search to Captain Ibes, Stewart's supervisor. *Id.* ¶ 22. Ibes did not respond. *Id.* Defendant Deputy Warden Ogando was later touring the plaintiff's housing unit less than one month after the strip search. *See id.* ¶ 23. The plaintiff addressed his concerns to Ogando regarding the strip search. *Id.* The plaintiff told Ogando that the prison's Administrative Directives did not authorize strip searches after video visits. *Id.* Ogando responded, "'I know what the directive says[;] just [bear] with me[.] I know that it[']s frustrating for you as it is for me[,] too.'" *Id.* Ogando explained that "since video visits at Robinson CI take place in the visiting room, strip searches after said visits will continue until he and defendant Caron can figure it out." *Id.* The plaintiff has continued to be strip searched after video visits while he has been exhausting his administrative remedies. *Id.* ¶ 24.

3

## II.     Discussion

The plaintiff's complaint alleges three counts related to the practice of strip searching inmates after video visits: 1) unreasonable search in violation of the Fourth Amendment; 2) cruel and unusual punishment under the Eighth Amendment; and 3) unreasonable search under the Connecticut state constitution. ECF No. 9 ¶¶ 26–34.

### A.  Unreasonable Search under the Fourth Amendment

The plaintiff argues that the routine strip searches of him after video visits violate his rights under the Fourth Amendment. *See* ECF No. 9 ¶¶ 26–28. "[I]nmates retain a limited right to bodily privacy under the Fourth Amendment." *Harris v. Miller*, 818 F.3d 49, 57 (2d Cir. 2016). "Courts assessing an inmate's claim that officers infringed his or her right to bodily privacy must undertake a two-part inquiry: (1) First, the court must determine whether the inmate has 'exhibit[ed] an actual, subjective expectation of bodily privacy'; and (2) second, the court must determine 'whether the prison officials had sufficient justification to intrude on [the inmate's] fourth amendment rights.'" *Id.* (quoting *Covino v. Patrissi*, 967 F.2d 73, 77–78 (2d Cir. 1992)).

When considering the second question, "courts apply one of two separate but overlapping frameworks." *Id.* "If the inmate's Fourth Amendment claim challenges a prison regulation or policy, courts typically analyze the claim under *Turner v. Safley,* 482 U.S. 78 [ ] (1987)." *Id.* "Under *Turner*, 'the regulation is valid if it is reasonably related to legitimate penological interests.'" *Id.* at 57–58. Courts rely on the four factors discussed in *Turner* to decide if the regulation is reasonable. *Id.* (citing *Covino,* 967 F.2d at 78–79 (discussing the *Turner* factors)). On the other hand, "if the inmate's Fourth Amendment claim challenges an isolated search, courts typically apply the standard set forth in *Bell v. Wolfish,* 441 U.S. 520 [ ] (1979)." *Id.*

Before the Court determines whether *Turner* or *Bell* applies, it must determine whether the plaintiff had an "actual, subjective expectation of bodily privacy" when he was strip searched, *see id.* at 57, and whether "the subjective expectation is one that society is prepared to accept as reasonable." *White v. Doe*, No. 3:16-CV-01874 (JAM), 2021 WL 4034164, at *4 (D. Conn. Sept. 3, 2021) (citing *Covino*, 967 F.2d at 77 (appropriate inquiry is whether the prisoner "has exhibited a subjective expectation of privacy and whether society is prepared to recognize that expectation of privacy as reasonable")).

The strip search here required the plaintiff to "lift his testicles, raise his arms, turn around, bend, squat, [and] cough while spreading his buttocks." ECF No. 1 ¶ 19. "[T]here is no dispute that a visual body cavity search is a 'serious invasion of privacy.'" *Velez-Shade v. Population Mgmt.*, No. 3:18CV1784(JCH), 2019 WL 4674767, at *9 (D. Conn. Sept. 25, 2019) (citing *Harris*, 818 F.3d at 58). Thus, at this early stage, the Court will assume that the plaintiff had an "actual, subjective expectation of bodily privacy" that society was prepared to accept as reasonable. *See id.* (assuming this in an initial review order where the plaintiff was required to squat and cough during a strip search).

Next, the Court must determine whether invading the plaintiff's privacy was justified. *See Harris*, 818 F.3d at 57 (quoting *Covino*, 967 F.2d at 77–78). The plaintiff only describes one strip search in his complaint. *See* ECF No. 9 ¶¶ 15–20. If this strip search was an isolated incident, the Court would analyze the justification for it under *Bell*. *See id.* at 58 (applying *Bell* to challenges of an "isolated search"). But the plaintiff alleges that this strip search was conducted under a "routine strip search policy" and that he has been subjected to multiple such searches since the original search described. *See* ECF No. 9 ¶ 24. Thus, because the plaintiff challenges a

5

policy, as opposed to an isolated incident, the court must analyze the justification for the intrusion under *Turner*. *See Harris*, 818 F.3d at 57 (*Turner* applies to challenges to prison regulations or policy).

The *Turner* Court "listed four factors governing the review of prison regulations: (i) whether there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it; (ii) whether there are alternative means of exercising the right in question that remain open to prison inmates; (iii) whether accommodation of the asserted constitutional right will have an unreasonable impact upon guards and other inmates, and upon the allocation of prison resources generally; and (iv) whether there are reasonable alternatives available to the prison authorities." *Covino*, 967 F.2d at 78–79 (citing *Turner,* 482 U.S. at 89–90).

"Correctional officials have a legitimate interest, indeed a responsibility, to ensure that jails are not made less secure by reason of what new detainees may carry in on their bodies." *Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 566 U.S. 318, 322 (2012). Courts in this circuit have thus recognized that there is "a valid, rational connection between [a correctional institution's] post-classification strip search policy and the legitimate governmental interest of preventing contraband distribution within the [correctional institution]." *Sassi v. Dutchess Cnty.*, No. 9:16-CV-1450, 2019 WL 401951, at *14 (N.D.N.Y. Jan. 31, 2019). This is so because a newly arriving inmate can secrete contraband into his body and distribute it to other inmates once inside the facility. *See id.*

The same concerns apply when an inmate has a contact visit. *See Block v. Rutherford*, 468 U.S. 576, 586 (1984) (noting that "[c]ontact visits…open the institution to the introduction

of drugs, weapons, and other contraband. Visitors can easily conceal guns, knives, drugs, or other contraband in countless ways and pass them to an inmate unnoticed by even the most vigilant observers."). Thus, the Supreme Court has upheld a prison policy of conducting visual body cavity searches after every contact visit with someone from outside the prison. *See Bell*, 441 U.S. at 559–60.

The security concerns animating these decisions are not present here. The visits here are by video, not in person. *See* ECF No. 9 ¶ 12. The visitor is not in the facility, let alone in the same room as the inmate. *See id.* Thus, there is no way for a video visitor to pass contraband to the inmate and thus no way for the inmate to pass contraband to the general population after the video visit. Defendant Stewart acknowledged this. *See* ECF No. 9 ¶ 20 (stating to the plaintiff that "I know that you're not able to smuggle any contraband through a computer[;] it makes no sense for us to be having to strip search inmates after video visits…").

Other courts have concluded that strip searches under similar circumstances are unjustified by a legitimate penological interest. *See, e.g., Bono v. Saxbe,* 620 F.2d 609, 617 (7th Cir. 1980) (observing policy of strip searching prisoners after non-contact visit is not justified by the rationale in *Bell*, which should not be extended to these searches "without a showing that there is some risk that contraband will be smuggled into [the prison] during non-contact, supervised visits, or that some other risk within the prison will be presented."). The Court agrees with the *Bono* court and finds that its reasoning applies here. It does not appear that strip searches after video visits serve any legitimate governmental interest.

The remaining *Turner* factors are largely inapplicable. As to "whether there are alternative means of exercising the right in question that remain open to prison inmates," *Covino*,

967 F.2d at 78, the "right in question" is the Fourth Amendment right to be free from unreasonable searches. If prison officials stopped strip searching inmates after video visits, that right would remain respected. The "accommodation of the asserted constitutional right will [not] have an unreasonable impact upon guards and other inmates [or] upon the allocation of prison resources generally," *id.* (bracketed material added), because prison security would still be maintained and correctional officers would expend less time and effort strip searching inmates. And because there would be no further security risk by ending the policy, "there are reasonable alternatives available to the prison authorities"—the prison would be no worse off if it stopped strip searching inmates after video visits.

"[A] strip search is unconstitutional if it is unrelated to any legitimate penological goal or if it is designed to intimidate, harass, or punish." *Jean-Laurent v. Wilkerson*, 438 F.Supp.2d 318, 323 (S.D.N.Y. 2006), aff'd, 461 F. App'x 18 (2d Cir. 2012) citing (*Covino,* 967 F.2d at 80 (citation omitted); *Hodges v. Stanley,* 712 F.2d at 34, 35–36 (2d Cir. 1983) (second strip search performed soon after a first strip search served no legitimate interest when prisoner was under continuous escort); *Bono,* 620 F.2d at 617). While there is little suggestion in the complaint that the strip search policy was *designed* to intimidate, harass, or punish, *id.*, that is immaterial because the policy is unrelated to a legitimate penological goal. Accordingly, the plaintiff's Fourth Amendment claim may proceed.

### B. Unreasonable Search under Article 1, § 7 of the Constitution of Connecticut

The plaintiff also alleges that the strip search policy described above is unconstitutional under Article 1, § 7 of the Constitution of Connecticut. *See* ECF No. 9 ¶¶ 32–34. The "Connecticut Supreme Court has, on a number of occasions, held that Article First, § 7 of the

8

constitution of Connecticut provides an individual with more protection than under the federal Fourth Amendment." *Freedman v. Am. Online, Inc.*, 412 F.Supp.2d 174, 190 (D. Conn. 2005). The Court has permitted the plaintiff's Fourth Amendment claim to proceed. Because the Fourth Amendment in some cases affords less protection than Article 1, § 7 of the Constitution of Connecticut, a potential violation of the Fourth Amendment would also potentially violate Article 1, § 7 of the Constitution of Connecticut. Accordingly, the Court also permits the plaintiff's unreasonable search claim under Article 1, § 7 of the Constitution of Connecticut to proceed.

### C. Cruel and Unusual Punishment under the Eighth Amendment

The plaintiff last claims that the strip search policy described above violates his right to be free from cruel and unusual punishment under the Eighth Amendment. *See* ECF No. 9 ¶¶ 29–31. A prison official violates the Eighth Amendment's prohibition against cruel and unusual punishment when the official's action involves the "unnecessary and wanton infliction of pain." *Whitley v. Albers*, 475 U.S. 312, 319 (1986) (quoting *Ingraham v. Wright*, 430 U.S. 651, 670 (1977)). To succeed on an Eighth Amendment claim, a plaintiff "must show (1) a deprivation that is objectively, sufficiently serious…and (2) a sufficiently culpable state of mind on the part of the defendant official." *Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001) (internal quotation marks omitted). The deprivations must be examined in light of contemporary standards of decency to determine whether they are sufficiently serious. *See Helling v. McKinney*, 509 U.S. 25, 35–36 (1993); *see also Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). Subjectively, the plaintiff must show that the defendants "know[ ] that inmates face a substantial risk of serious harm and disregard[ ] that risk." *Farmer v. Brennan*, 511 U.S. 825, 847 (1994).

9

"Under certain limited circumstances, the manner in which a search is conducted may give rise to an Eighth Amendment claim." *George v. City of New York*, Nos. 12–6365, 13–3511, 13–3514, 2013 WL 5943206, at *9 (S.D.N.Y. 2013) (citing *Frazier v. Ward*, 426 F. Supp. 1354, 1356 (N.D.N.Y. 1977)). However, courts are generally reluctant to conclude that strip searches—even where an inmate alleges aggressive or inappropriate behavior—rise to the level of being objectively serious enough to constitute an Eighth Amendment violation. *Id.* (collecting cases). With regard to searches where officers make contact with prisoners, "[a] correction officer's intentional contact with an inmate's genitalia or other intimate area, which serves no penological purpose and is undertaken with the intent to gratify the officer's sexual desire or humiliate the inmate, violates the Eighth Amendment." *Crawford v. Cuomo*, 796 F.3d 252, 257 (2d Cir. 2015). The "principal inquiry" a court must make "is whether the contact is incidental to legitimate official duties, such as a justifiable pat frisk or strip search, or by contrast whether it is taken to arouse or gratify the officer or humiliate the inmate." *Id.* at 257–58. "[P]rison officials looking for contraband may subject inmates to reasonable strip searches and cavity searches," but such a search "may not be undertaken maliciously or for the purposes of sexually abusing the inmate." *Id.* at 258.

Courts in this Circuit have held that "a strip search without elements of sexual harassment, excessive force, or indeed any physical contact at all is not 'sufficiently serious' under the objective prong to support a claim based on cruel and unusual punishment under the Eighth Amendment." *George*, 2013 WL 5943206, at *10; *see also Little v. City of New York*, No. 13–3813, 2014 WL 4783006, at *3 (S.D.N.Y. Sept. 25, 2014) ("[C]ourts in this Circuit require the plaintiff to allege that the defendant engaged in egregious conduct during the strip search to

state an Eighth Amendment violation."). Indeed, allegations of far more serious misconduct by corrections officers than those alleged in this case have consistently been held insufficiently serious to state a claim under the Eighth Amendment. *See George*, 2013 WL 5943206, at *9–10 (collecting cases, including cases where multiple instances of sexual abuse were not sufficient).

Here, the plaintiff's allegations are insufficiently serious to state an Eighth Amendment claim because the strip search did not involve "elements of sexual harassment, excessive force, or indeed any physical contact at all." *George*, 2013 WL 5943206, at *10. Although the plaintiff has properly raised a Fourth Amendment claim related to the strip searches after video visits, his allegations do not rise to the level of an Eighth Amendment claim. *See, e.g.*, *Murray v. Bushey*, No. 04-00805, 2009 WL 498144, at *5–6 (N.D.N.Y. February 26, 2009). The Court accepts for the purpose of this review that the plaintiff was "humiliate[d], dehumanize[d], and embarrass[ed]," ECF No. 9 ¶ 30, and that the strip search could have been done differently with less exposure to others. However, the Court is bound by the law, and not every psychological discomfort a prisoner is forced to endure will amount to a constitutional violation. *See Calhoun v. DeTella*, 319 F.3d 936, 939 (7th Cir. 2003). The Plaintiff's allegations are simply not sufficiently serious under the Eighth Amendment. This claim must be dismissed for failure to state a claim.

### D. <u>Relief</u>

The plaintiff sues three defendants: Warden Caron, Deputy Warden Ogando, and correctional officer Stewart. ECF No. 9 ¶¶ 4–6. He sues these defendants in their official capacities for injunctive relief and in their individual capacities for monetary damages. *Id.* ¶ 7. The Eleventh Amendment does not preclude suits against state officials acting in their official

capacity that seek prospective injunctive relief, so long as the official sued has "some connection with the enforcement of the [allegedly unconstitutional act]," *see Ex parte Young,* 209 U.S. 123, 155–57 (1908), and the injunctive relief addresses an ongoing or continuing violation of federal law or a threat of a violation of federal law in the future. *See In re Deposit Ins. Agency,* 482 F.3d 612, 618 (2d Cir. 2007); *Ward v. Thomas*, 207 F.3d 114, 120 (2d Cir. 2000).

All three defendants have some connection to the enforcement of the allegedly unconstitutional act. Stewart conducted the allegedly unconstitutional strip search. *See* ECF No. 9 ¶¶ 17–19. Stewart indicated that he conducted the strip search on Caron's orders. *See id.* ¶ 20. And Ogando told the plaintiff that "strip searches after [video] visits will continue until he and defendant Caron can figure it out," *id.* ¶ 23, suggesting that Ogando is either jointly responsible with Caron for promulgating the policy or acting at the direction of Caron to enforce it. Thus, all defendants have some connection to the enforcement of the act.

The plaintiff maintains that he continued to be subjected to the allegedly unconstitutional searches before filing suit, *see id.* ¶ 24, so the Court can infer that the strip searches after video visits are on-going. The injunctive relief the plaintiff requests—cessation of the strip searches after returning from non-contact or video visits unless there is reasonable suspicion, ECF No. 9 at 8—addresses this on-going alleged constitutional violation. Thus, plaintiff may pursue injunctive relief against the three defendants in their official capacity.

A plaintiff seeking monetary damages from a defendant must allege facts that establish the personal involvement of that defendant in the alleged constitutional violation. *See Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) ("personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983."). This is true

12

with respect to supervisory officials, as well. *Tangreti v. Bachman*, 983 F.3d 609, 620 (2d Cir. 2020). The Second Circuit has held that "there is no special rule for supervisory liability." *Id*. at 618. Rather, "[t]o hold a state official liable under § 1983, a plaintiff must plead and prove the elements of the underlying constitutional violation directly against the official without relying on a special test for supervisory liability." *Id*. at 620. Thus, the plaintiff "must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" *Id*. at 616 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)). A supervisor's mere knowledge of a constitutional violation is insufficient to establish personal involvement. *See id*. 616–17 (noting that "[a] supervisor's 'mere knowledge of his subordinate's discriminatory purpose' is not sufficient because that knowledge does not 'amount[ ] to the supervisor's violating the Constitution.'") (quoting *Iqbal*, 556 U.S. at 676).

The plaintiff has sufficiently alleged that Stewart was personally involved in the alleged constitutional violation because he conducted the strip search. *See* ECF No. 9 ¶¶ 17–19. Although a supervisor cannot be found liable solely "by reason of [his] supervision of others who committed the violation," *Tangretti*, 983 F.3d at 619, "it seemingly remains possible for a policy maker to be held liable for his creation or continuance of an unconstitutional policy or custom." *Jok v. City of Burlington, Vt.*, No. 2:19-cv-70, 2022 WL 444361, at *11 (D. Vt. Feb. 14, 2022) (citing *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010) (holding that "§ 1983 [still] allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy" which results in a violation of constitutional rights)); *Stone #1 v. Annucci*, No. 20-CV-1326 (RA), 2021 WL 4463033, at *9 (S.D.N.Y. Sept. 28, 2021) ("Reading *Tangreti*

and ... other decisions together,…a senior prison official can still be held liable for his role in creating a policy…, but…only if the pleadings or record evidence 'permit the inference that [he] had subjective knowledge of the risk…and that [he] decided to disregard that risk.'" (quoting *Tangreti*, 983 F.3d at 619)).

*Tangreti* notwithstanding, Caron and Ogando can still be sued for damages in their individual capacities because they either promulgated the alleged constitutional policy or carried it out knowing, but disregarding, the risk it entailed. *See* ECF No. 9 ¶ 23 (Ogando's acknowledgement to the plaintiff that the strip searches were unnecessary but that they would continue until he and Caron could "figure it out."). The plaintiff may sue all three defendants for damages in their individual capacity.

### III.  Conclusion

The plaintiff's unreasonable search claims under the Fourth Amendment and Article 1, § 7 of the Constitution of Connecticut may proceed. The plaintiff may sue Caron, Ogando, and Stewart in their official capacities for injunctive relief and in their individual capacities for damages. The plaintiff's Eighth Amendment claim is dismissed.

The Court enters the following additional orders.

(1)     **The Clerk shall** contact the Department of Correction Office of Legal Affairs to ascertain a current service address for Defendants, mail a waiver of service of process request packet containing the Complaint and this Order to each defendant at the address provided within **twenty-one (21) days** of this Order, and report to the court on the status of the waiver request on the thirty-fifth day after mailing. If any defendant fails to return the waiver request, the Clerk

shall arrange for in-person service by the U.S. Marshals Service on the defendant in his individual capacity and the defendant shall be required to pay the cost of such service.

(2) **The Clerk shall** send the plaintiff a copy of this Order.

(3) **The Clerk shall** send a courtesy copy of the Complaint and this Order to the Connecticut Attorney General and the Department of Correction Office of Legal Affairs.

(4) The defendants shall file their response to the complaint, either an answer or motion to dismiss, within **sixty (60) days** from the date the waiver forms are sent. If they choose to file an answer, they shall admit or deny the allegations and respond to the cognizable claim recited above. They also may include all additional defenses permitted by the Federal Rules. **In addition, because the plaintiff's allegations, if credited, would almost certainly result in the Court's issuing injunctive relief against the three defendants in their official capacities for creating, maintaining, and enforcing a policy that, if the complaint accurately describes it, appears to be blatantly unconstitutional, the three defendants are required to SHOW CAUSE within 75 days of this order why the Court should not immediately enjoin the policy requiring strip searches following video visits.**

(5) Discovery, pursuant to Federal Rules of Civil Procedure 26 through 37, shall be completed within **seven months (210 days)** from the date of this order. Discovery requests need not be filed with the court.

(6) All motions for summary judgment shall be filed within **eight months (240 days)** from the date of this order.

(7) Pursuant to Local Civil Rule 7(a), a nonmoving party must respond to a dispositive motion within twenty-one (21) days of the date the motion was filed. If no response is filed, or the response is not timely, the dispositive motion can be granted absent objection.

(8) If the plaintiff changes his address at any time during the litigation of this case, Local Court Rule 83.1(c)2 provides that he MUST notify the court. Failure to do so can result in the dismissal of the case. The plaintiff must give notice of a new address even if he is incarcerated. The plaintiff should write PLEASE NOTE MY NEW ADDRESS on the notice. It is not enough to just put the new address on a letter without indicating that it is a new address. If the plaintiff has more than one pending case, he should indicate all the case numbers in the notification of change of address. The plaintiff should also notify the defendants or the attorney for the defendants of his new address.

(9) The plaintiff shall utilize the Prisoner Efiling Program when filing documents with the court. The plaintiff is advised that the Program may be used only to file documents with the court. As local court rules provide that discovery requests are not filed with the court, discovery requests must be served on defendants' counsel by regular mail.

(10) The Clerk shall immediately enter the District of Connecticut Standing Order Re: Initial Discovery Disclosures concerning cases initiated by self-represented inmates and shall send a copy to the plaintiff.

**SO ORDERED** this 13th day of September 2024 at Hartford, Connecticut.

/s/
Michael P. Shea
United States District Judge

16